## MOTORFRIGERATOR CO. v. FRIGIDAIRE SALES CORPORATION.

No. 3257.

Circuit Court of Appeals, Fourth Circuit.

June 13, 1932.

J. Le Roy Hopkins and Edwin F. Samuels, both of Baltimore, Md., for appellant.

Drury W. Cooper, of New York City (Thomas J. Byrne, of New York City, and William H. Hudgins, of Baltimore, Md., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This suit in equity was brought by the Motorfrigerator Company, assignee of the United States patent to A. S. Lewis No. 1,673,082 of August 9, 1920, for patent infringement, alleged to have been committed by the defendant, Frigidaire Sales Corporation. The patent relates to an improvement in automatic mechanical refrigerators, such as are commonly employed in domestic use. The fundamentals of such a device, which are common to Lewis and to the prior art, are a compressor, a condensor, an expansion valve, an expansion or cooling coil, and conduits for the movement of the refrigerant from part to part of the apparatus in the operation of the cycle. The compressor, operated by an electric motor, compresses a refrigerating medium, such as ethyl chloride or sulphur dioxide in gaseous form. It is conducted thence to the condenser, and there converted from a gas into a liquid state. It then passes through the expansion valve into the expansion coil, where it is transformed or evaporated into a gas. By the conversion of the liquid to a gas, heat is absorbed, and the heat-laden gas is conducted back to the condenser. The operation of the cycle may be indefinitely continued, but in practice it is arrested by a thermostat when the box or cabinet shall have been cooled to the desired extent, and it is started again when the temperature has risen to a fixed point. In the operation of such devices, moisture from the food in the refrigerator is deposited upon the expansion or cooling coil, and is there frozen and the coating of frost or ice becomes thicker and thicker, so long as the machinery is running. It is therefore common practice to stop the machinery at intervals in order to defrost the coil; that is, to melt the accumulated ice.

In the Lewis machine, the motor, compressor, and condenser are situated in a space

at the bottom of the box, designated as the operating chamber, while the expansion valve and coil are supported by a pan located at the top of the box in the refrigerating chamber above the space containing the food to be cooled. The Lewis specification does not speak of defrosting the coil, but says that the cycle of operations is continued until sufficient heat units have been absorbed from the food chamber of the refrigerator to reduce the temperature to the desired degree when a thermostat will operate to stop the motor. After the temperature in the food chamber again rises, the thermostat will operate to start the motor and re-establish the cycle of operations. The specification states that the pan, which supports the expansion coil in the refrigerating chamber, serves to receive any condensation which may be formed therein; and the pan is drained by a drip pipe which runs downwardly into the lower compartment where the operating unit is situated. A small open trap is attached to the lower end of the pipe, and the moisture is finally disposed of by evaporation induced by the heat emanating from the operating unit, and by the forcible expulsion from the chamber of the moistened air by means of a draft upwardly through a flue in the back of the cabinet. Air for cooling the motor enters through an opening in the front of the operating compartment at the bottom, and passes out through the flue in the rear. The Lewis refrigerator, as constructed for sale, contained two additional features in the operating compartment, not shown by the patent, to facilitate evaporation. They were fans to increase the circulation of the air and a pan beneath the machinery to receive any overflow of water from the trap that might occur.

Lewis' claim to patentable invention resides in the disposition of the moisture deposited on the coil, i. e., in the plan for conducting the water condensed upon the cooling coil, from the upper or refrigerating chamber to the lower or operating chamber through a drip pipe and the evaporation of the water in the lower chamber from the heat there developed and the current of air created as described in the specification. Not all of the steps in this operation were new, because the bringing down of the accumulated moisture from an upper refrigerator chamber to a lower operating chamber was known to the art. The novelty in the patent was necessarily limited to the method of getting rid of the water by evaporation, instead of by a drain pipe or by the removal of a

receptacle from time to time in which the water had been allowed to accumulate. Such an arrangement is not without value, particularly in the case of refrigerators for homes or apartments, because it makes it unnecessary to dump the pan of water from time to time.

The patent contains two claims, which are as follows:

"1. In a refrigerator having cooling coils disposed within its refrigerating chamber, a moisture collecting pan disposed for collecting moisture, condensed on the cooling coil, means for feeding the condensed moisture out of the refrigerating chamber into a lower portion of the refrigerator, and means for thereafter causing air outside of the refrigerating chamber to absorb the said moisture and for expelling the resulting moistened air from the refrigerator.

"2. The method of reducing the moisture content of the air in the refrigerating chamber of a refrigerator, which consists in condensing moisture from the air on a chilled surface within the said chamber, conducting the condensed moisture out of the chamber, causing air drawn from outside the refrigerator to absorb the condensed moisture, and forcibly expelling the thus moistened air from the refrigerator."

The narrow scope of the patent, in view of the prior art, is emphasized by the fact, as shown by the testimony of the inventor, that, before he conceived his idea, he had in his possession a refrigerator built by one Wolf which resembled the Lewis device in most respects. Wolf led the condensation incident to defrosting from the refrigerating into the operating department. He accumulated the water there in a pail hung in the compartment. Lewis substituted a trap for the bucket. His sole claim to differentiation from Wolf is in removing the bucket, and in the provision for the opening in the lower part of the cabinet through which the air enters the operating compartment, and the flue at its back through which the air passes out. Speaking of the operation of his machine, Lewis gave the following testimony:

"In the operation of this machine the cycle consists of about 15 minutes operation and an hour of rest. During the operation of the machine, the cooling coils would become frosted with the condensed moisture from the air that was circulating over the food compartment through that coil. Then during the rest period the frosted moisture

would melt off and be carried down into the pan below so that it was almost a continuous cycle of very frequent intervals and it was a continual collection of moisture carried down into the lower compartment. * * * In this machine (the machine of the patent in suit) there was a continual change from defrosting to frosting, furnishing a small amount of water at all times.

\* \* \* \* \*

"The trickling down of the moisture from the cooling coil to what I regard as the pan, is practically continuous, due to the short period of accumulation of frost on the coil and the longer period that the machine is at rest when the defrosting takes place. That cycle was a matter of design with the whole apparatus, so that I built it with that sort of cycle in which the refrigerating period was fifteen minutes and the idle or defrosting period was about an hour. That is the way my machine worked. It was carefully designed so that the heat of the compressor and condensing coil, plus the fan that I put in the chamber, would get rid of all the moisture about as it trickled down."

The first machine embodying the invention was built in December, 1920. The plaintiff corporation was formed and a few machines were built and sold; but the business was not a success, and no manufacturing was done after the year 1924.

The Frigidaire machines, alleged to infringe the patent, are exemplified by one introduced in evidence as Defendant's Exhibit E, to which the discussion on the subject of infringement has been for the most part confined. It comprises a cabinet containing a lower compartment, in which is housed the compressor, a condenser which receives the compressed refrigerant, in this case, sulphur dioxide, from the compressor, a suction fan on the compressor shaft for drawing air in, and a fan on the motor shaft for expelling the air from the compartment, which is open at the back. Suitable conduits lead from the condensor to conduct the liquid refrigerant to the expansion valve, and thence to the expansion coil in the food compartment which is located in the upper part of the cabinet. From this point the refrigerant is returned in gaseous state to the compressor. A drip pan is shown under the refrigerating coil in the top of the refrigerator. A funnel, connected with a conduit, is arranged to receive defrosting water from the pan under the refrigerating coil, and pipe it to the lower compartment of the refrigerator into a removable defrosting pan located in the upper part of the operating compartment and mounted on guides to admit of its ready removal. This pan holds six quarts of water. It is employed to receive condensation during the defrosting operation of the refrigerator.

The Frigidaire machine differs in its method of operation from the Lewis machine shown in the patent in suit in substantial respects. Like the Lewis machine, the refrigerating apparatus does not run continuously, but stops and starts automatically as the temperature falls below and rises above the desired point; and this starting and stopping continues automatically until the switch of the motor is shut off independently of the thermostat. Unlike the Lewis machine, the temperature in the Frigidaire is maintained at so low a point as to cause the freezing of water in ice cubes in trays in the coil compartment. Even during the periods when the machine stops automatically, there is no melting of the frosted moisture which is deposited or frozen upon the cooling coil. This connotes something quite different from the Lewis machine in which the cycle consists of alternating periods, one of fifteen minutes, during which the machinery is in operation, followed by one of an hour of rest. During this entire hour, if not during the fifteen-minute period, there is a constant trickling of the moisture into the evaporating pan. With the Frigidaire, there is no defrosting except in the regular defrosting periods which occur about once in two weeks in the summer and about once a month in the winter. Between defrosting periods, there is a constantly accumulating deposit of ice upon the coil. During defrosting periods, the ice is melted off the coil and accumulates in considerable quantities in the pan in the operating compartment.

The material question of fact, having regard to the charge of infringement, is whether the water there accumulated is evaporated by the action of the heat produced during the operation of the machinery and by the currents of air which pass in and out of the operating compartment under the forced draught of the fans. The complainant contends that the construction is substantially similar to that disclosed by the patent, and that the evidence shows that as a matter of fact so much of the water is evaporated that it is not necessary to remove the pan in the top of the machinery department to prevent its overflow. The defendant, on the other hand, contends that the pan is made removable so that it may be emptied, and that the evaporation caused by the heat in the pass-

age of the air currents is so slight that overflow will take place, unless this is done. It is pointed out that the machinery is air cooled, as in most refrigerating machines for domestic purposes, and that the opening in the back of the refrigerator and the air currents superinduced by the fans are designed for the necessary purpose of cooling the machinery during the operation.

The District Judge passed a decree dismissing the bill, being of the opinion that the plaintiff had failed to meet the burden of proving infringement. He found that, in the operation of the defendant's machines, the defrosting water was not disposed of by absorption or evaporation, but by removing the drip pan into which the water had been accumulated and emptying it. He therefore reached the conclusion that there was lacking in the defendant's device one of the elements of the patent described in claim 1 as a means for causing the air outside of the refrigerating chamber to absorb the said moisture and for expelling the resulting moistened air from the refrigerator. The judge concluded, however, that the Lewis patent, if limited in scope to the kind of machine contemplated by the patentee, was valid.

Since we agree with the District Court that there was no infringement of the patent, we shall confine ourselves to a consideration of this question. The testimony on behalf of the plaintiff at the trial below consisted for the most part of the recital of conversations which the witnesses had had with sales agents employed by the defendant in some of its numerous offices to sell the machine. The substance of these conversations was that in machines like the one under discussion, in which the drip pan for the accumulation of the defrosting water was placed in the operating department, the water would be evaporated during the normal operation of the machine and the pan would not have to be emptied. Some reliance was placed by the plaintiff upon the location of the drip pan at a place not readily visible in the upper part of the lower compartment, and upon the omission in recent years from a paster on the refrigerator door of a caution to the user to empty the pan after defrosting. There was, in addition, the testimony of an expert engineer who, without basing his opinion on an actual test, but relying on expert knowledge and general experiments with regard to conditions of evaporation, said that in his opinion the water produced by the defrosting operation in the Frigidaire machine would be caught in the pan in the operating compartment and evaporated without the necessity of dumping the pan.

There was no attempt on the part of the plaintiff to produce witnesses who had performed actual tests with defendant's machines; and this omission was the more significant in that the defendant's machines were openly sold at many places, thousands of them were confessedly in operation, and one at least was owned and operated in a residence of the president of the plaintiff corporation who testified as a witness in the case. The testimony of the defendant's witnesses, on the other hand, was uniformly to the effect that its salesmen were instructed always to warn users of Frigidaire machines to empty the pan at each defrosting, for otherwise the accumulated water would be likely to overflow. No salesman was ever authorized to say that the defrosting water would be evaporated during the operation of the machine, and that it was unnecessary to dump the water. In addition, there was evidence to show that the service department of the defendant had had complaints of the overflow of defrosting water within refrigerator, which was found to be due to the failure of the users to dump the water after defrosting. The defendant also relied upon expert testimony.

Under these circumstances, we think that the conclusion reached by the District Judge was supported by the weight of the testimony. The evidence introduced by the plaintiff in his prima facie case was overcome by that of the persons having actual experience in handling the machines sold by the defendant. The plaintiff contended that its failure to make an actual test of the defendant's machine in order to prove infringement was more than offset by the failure of the defendant to produce the evidence of customers or users of the Frigidaire. The rule was cited that, when a plaintiff makes out a prima facie case, and there are facts known to the defendant but not available to the plaintiff which would settle the issue raised, and the defendant fails to prove them, then a presumption arises that the evidence, if produced, would be favorable to the plaintiff's claim. There is no room for the application of such a presumption in this case, for it is obvious that the alleged infringing machines were easily accessible to the plaintiff had it seen fit to subject them to the test. The evi-

626

dence in the case would justify the finding that the Lewis machine disposes by evaporation of the moisture which continually trickles down into the operating compartment. There is no substantial accumulation of defrosting water at any time. The conditions of the Frigidaire machine are quite different, and it does not follow that the comparatively large quantity of water produced by it at infrequent intervals of defrosting will be likewise carried off by evaporation. The Lewis machine, as the patentee said, was designed to take care of all of the moisture created in the particular cycle of operation in which it is used.

■ The decree in this case was promulgated on the 23d day of December, 1930. The term of court then current expired on March 3, 1931. Subsequently, to wit, on March 12, 1931, the plaintiff filed a petition supported by affidavits containing additional testimony similar to that introduced at the hearing of the case and tending to show certain statements by sales agents of the defendant, supported by a letter, to the effect that in the Frigidaire machine the defrosting water was taken care of by evaporation and there was no need to empty the pan. The affidavits indicated that this evidence had been discovered since the trial of the case, and the petitioner prayed the court that the case be reopened and it be given a further opportunity to present the new testimony. Counter affidavits were also filed. The District Judge overruled the motion, being of the opinion that the petition was in effect one for rehearing filed after the term at which the decree had been entered, and that therefore under Equity Rule 69 (28 USCA § 723), no rehearing could be granted; and also for the reason that the evidence, as disclosed by the supporting affidavits, was merely cumulative, and would not alter the original findings of the court in the matter of infringement. The action of the court in this respect was also made a subject of this appeal. We think that the finding of the court was clearly right. It was too late to ask for a rehearing of the case; and, even if the petition had been filed in time, the matter was one within the discretion of the court, and it could not have been said, under the circumstances related, that an abuse of discretion had occurred. See Roemer v. Simon, 91 U. S. 149, 23 L. Ed. 267; Lewisburg Bank v. Sheffey, 140 U. S. 445, 451, 11 S. Ct. 755, 35 L. Ed. 493; Allis-Chalmers Mfg. Co. v. Columbus Electric & Power Co. (C. C. A.) 22 F.(2d) 737; Hazeltine Cor-

poration v. Wildermuth (C. C. A.) 35 F.(2d) 733.

Affirmed.