258 F.2d 593
 JOHNSON & JOHNSON, a corporation, James J. Purcell, Frank C. Beacham, and Lititz Knitting Company, a corporation, Appellants,
v.
CAROLINA LEE KNITTING CO., Inc., a corporation, Appellee.
 No. 7581.
 United States Court of Appeals Fourth Circuit.
 Argued April 9, 1958.
 Decided July 22, 1958.
 
 Thorley Von Holst, Chicago, Ill. (George A. Long, Paul H. Ridge, Graham, N. C., and Sidney Neuman, Chicago, Ill., on the brief), for appellants.
 Henry N. Paul, Jr., Philadelphia, Pa. (Robert B. Frailey, Armistead W. Sapp, Paul & Paul, Philadelphia, Pa., and Sapp & Sapp, Greensboro, N. C., on the brief), for appellee.
 Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and THOMSEN, District Judge.
 SOBELOFF, Chief Judge.
 
 
 1
 This appeal involves a patent in the surgical stocking art and raises the twin issues, the scope of the patentee's invention and whether the defendant has infringed. The District Court held the patent valid but not infringed, and the plaintiffs have appealed.
 
 
 2
 The plaintiffs are James J. Purcell, patentee; Frank C. Beacham, co-owner of the patent; Lititz Knitting Company, a Pennsylvania corporation which holds the exclusive license to manufacture the Purcell stocking; and Johnson & Johnson, exclusive licensee for its sale. The defendant is Carolina Lee Knitting Company, Inc., manufacturer of the accused stocking. It is a wholly owned subsidiary of Rosedale Knitting Company, purchaser of Carolina Lee's entire output. Rosedale, in turn, finishes and packages the Carolina Lee stockings and resells them to Scholl Manufacturing Company. The president of both Rosedale and Carolina Lee is E. Brand Beacham, and his son, Frank Beacham, one of the plaintiffs, was, until the institution of this litigation, a director and vice president of the two companies.
 
 
 3
 To meet the demands of the wearers, mostly women, surgical stockings for the treatment of certain peripheral vascular diseases must be attractive as well as therapeutically useful. For years the industry had been unable to produce an entirely satisfactory stocking. At first, the stockings on the market were made completely of rubber. They were heavy, poorly ventilated, and so unsightly that nylon stockings were frequently worn over them. Also in the prior art there was a stocking manufactured under Patent No. 2,169,203 issued in 1939 to Hinchcliff, knit of rubber and non-elastic yarn (silk or nylon), in alternating horizontal stitches, known in the knitting art as alternating "courses." Its failing lay, it is said, in the fact that the non-elastic yarn restricted the rubber and did not permit the stocking to stretch properly and sufficiently. A third stocking was made entirely of "HELANCA," a brand of synthetic crinkled and set yarn. This yarn consists of multifilament nylon which has been subjected to a high twist and then heat-set before being relaxed. The effect is that the yarn, when relaxed, has a "memory" and will resume its twisted, contracted state, like a coil spring. The restrictive pressure of helanca is much milder than that of rubber, and the all-helanca stocking proved therapeutically useless and was not manufactured commercially. Neumager, the patentee of the all-"HELANCA" yarn stocking, sought, in 1951, to amend his application to include the simultaneous use of rubber with helanca, but in the following year a patent examiner rejected the proposed amendment on the ground that it contained new matter. The amendment was then withdrawn but it continued to be part of the Neumager file wrapper. This patent was issued in 1953 as No. 2,641,914.
 
 
 4
 Purcell, a practical knitter with thirty years' experience, began experimenting with surgical stockings in 1953. In August of that year he knit the first sample of the fabric which achieved his desired result. His stocking was constructed of alternate courses of "HELANCA" yarn and rubber. It possessed the stretching and constricting qualities imparted by the rubber, but was made light, soft, porous, and attractive to sight by the "HELANCA" yarn. Through the aid of the younger Beacham, who was Purcell's neighbor and who later, in 1954, became a co-owner of the patent, Lititz and Johnson & Johnson became interested in Purcell's product and ultimately became licensees, as above indicated.
 
 
 5
 Ray Borda, a vice president of Carolina Lee, is the designer of the accused stocking. He shared an office with Frank Beacham at Carolina Lee while the Purcell stocking was being developed. The accused stocking did not appear until later, and it was claimed by plaintiffs that Carolina Lee became interested in surgical stockings only by having acquired knowledge of Purcell's great contribution, and that the defendant simply pirated the disclosures made by Frank Beacham to Borda. The District Judge, however, made no such finding. He determined that Rosedale and Carolina Lee first thought of manufacturing surgical stockings in 1952, but because rubber thread was then too coarse to be knit on their full-fashioned knitting machines, they abandoned the idea for the time being. They entered into the manufacture of surgical hosiery when fine gauge rubber yarns, capable of being knit on full-fashioned machines, became available.
 
 
 6
 The accused stocking consists of rubber courses, alternating with courses that combine helanca with plain, inelastic nylon.
 
 
 7
 Construing The Purcell Patent.
 
 
 8
 Pursuant to his application made in October, 1954, Purcell was granted, on March 1, 1955, a patent for his stocking, No. 2,702,998. In the specification, the inventor notes the shortcomings of the prior art stockings, and recites that his is made "by knitting a fabric of some of the courses of rubber yarn and by interspersing said courses with other courses knit of an elastic textile but non-rubber yarn." (Helanca.) Continuing, he specifies, "I knit this yarn under no tension so that the length of yarn used in each course will, if stretched out straight, be far in excess of the length of the course." "The net effect," states the specification of the patent, is that the feel, weight and appearance of the stocking are improved, "without limiting the capacity of the rubber yarn to stretch." Throughout the claims, the participial phrase is repeated, "said synthetic yarn being knit in its relaxed condition."
 
 
 9
 At the trial the Court was greatly concerned with the scope of the patent. Construing the claims in the light of the specification, (Hutzler Bros. Co. v. Sales Affiliates, 4 Cir., 1947, 164 F. 2d 260, 263), the Judge decided that although Purcell had been issued a product patent, the phrase "knit in its relaxed condition" refers back to the "no tension" language in the specification and denotes a process step, the patent meaning that, as the helanca is fed to the knitting needles, it is to be subjected to no undue tension. Cf., Smith v. Goodyear Dental Vulcanite Co., 1876, 93 U.S. 486, 493, 23 L.Ed. 952; In re Shortell, 1949, 173 F.2d 993, 996, 36 C.C.P.A., Patents 1013. The use of this process, according to the Judge, is an essential element of the Purcell invention, and the elimination of this element in the manufacture of another stocking will result in no infringement.
 
 
 10
 The plaintiffs take issue with the Judge's interpretation. They argue that the language under consideration has been misconstrued as incorporating a process step into the patent; that in reality it was merely descriptive of the finished product, and that the patentee meant only that the helanca when incorporated in the finished stocking was to be in a relaxed condition.
 
 
 11
 This contention cannot be sustained. The record abundantly supports the interpretation made by the District Judge. There is testimony showing that in the knitting process the length of yarn which is knit into a given course of stitches is determined not only by the size of the loops made by the knitting needles, but also by the amount of tension, or stretching, exerted on the yarn as it travels to the needles from the spool or cone from which it is unwound. Thus, if there is less tension on the helanca as it is drawn toward the needles, more yarn is knit into each loop, and more helanca finds its way into the finished fabric. The more helanca in the finished stocking, the less tension it is under there, and, consequently, being in greater relaxation, it tends to be more elastic. Purcell was well aware of this principle and it was because of it that his stocking was successful. By removing certain conventional tension devices from the knitting machine, Purcell found that he could knit enough helanca into each of the alternating helanca courses so that they would stretch harmoniously with the rubber. This was the process step which Purcell evidently found essential, and to which he referred repeatedly in his patent.
 
 
 12
 In a pre-trial deposition the inventor himself frankly admitted, contrary to his present contention, that, "In the art of the trade, I knit this yarn under no tension as it is fed from the cone to the knitting elements. This is what is meant by the specification in the patent application."[1] By "no tension", the inventor explained in his deposition, he meant "no undue tension." Experts produced by the defendant, and credited by the District Judge, testified unequivocally that participial phrases such as that in the Purcell patent claims are commonly used to denote a process step, and that, to one skilled in the art, the "no tension" language refers to the yarn as it travels from the yarn cone to the knitting elements.
 
 
 13
 Considering the ambiguity of the phrases and the conflicting interpretations adopted from time to time by the plaintiffs themselves, and considering also the defendant's testimony, we are unable to say that the District Judge was clearly erroneous in his construction of the Purcell patent. We therefore need not concern ourselves with the defendant's further argument that if the broader interpretation demanded by the plaintiffs were adopted, the patent would be invalid for lack of novelty over the prior art as disclosed by Neumager. Nor need we pass upon the related contention of the defendant that if the method of knitting is not a part of the patent, then the patentee has merely substituted another material ("HELANCA" yarn) for that prescribed by Hinchcliff (inelastic yarn) and this would not be sufficient foundation for the patent. See, Goldman v. Polan, 4 Cir., 1938, 93 F.2d 797, 799.
 
 
 14
 Infringement.
 
 
 15
 There is greater uncertainty, however, in respect to the District Court's conclusion that the manufacturing method practiced by the defendant does not infringe. The issue is whether, as the defendant asserts, it has omitted an essential process step of the patent and does not infringe, Montgomery Ward & Co. v. Rogers, 4 Cir., 1939, 100 F.2d 721, 722; Anthony v. Sherman, 4 Cir., 1947, 159 F.2d 995, 997; Kay Patents Corp. v. Martin Supply Co., 4 Cir., 1953, 202 F.2d 47, 51; Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 4 Cir., 1957, 243 F.2d 136, 140; or whether, as the plaintiffs charge, the defendant does use the same process, thinly disguised, resulting in the production of a perhaps less efficient product but one which nevertheless infringes. Vacuum Cleaner Co. v. Innovation Electric Co., 2 Cir., 1916, 239 F. 543; Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550; Graver Tank & Mfg. Co. v. Linde Co., 1950, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097; Hartford-Empire Co. v. Swindell Bros., 4 Cir., 1938, 96 F.2d 227.
 
 
 16
 Comparison of the two knitting processes and their products will be simplified if we advert first to the plain inelastic nylon thread which is introduced into the accused stocking in addition to the rubber yarn and the "HELANCA" yarn. The defendant itself establishes that the inelastic nylon in its stocking is functionless. While each course of its stocking, according to the defendant, contains 24 inches of fully stretched "HELANCA" yarn, the inelastic nylon is slightly longer, being 24.2 inches. The stretching of the helanca, therefore, cannot be restricted by the plain nylon, which merely "floats" in the accused stocking. Nor can the plain nylon restrict the stretch of the rubber yarn more than the rubber is restricted by the fully stretched "HELANCA" yarn, which is shorter than the inelastic nylon.
 
 
 17
 Of course, if the defendant in fact departs from the teaching of the patent, not making a simulated departure merely while copying the essence of the patent, it cannot be held liable for infringement. See, 40 Am.Jur., "Patents," Sec. 155, p. 642. It is equally axiomatic in the law of patents that the addition of a useless or unimportant item cannot avoid infringement, but is recognized as a frequent resort of infringers to mask their true purpose. 40 Am.Jur., "Patents," Sec. 155, p. 643; Beach v. Inman, C.C.N.D.N.Y.1896, 75 F. 840, 842; Vacuum Cleaner Co. v. Innovation Electric Co., 2 Cir., 1916, 239 F. 543; Lampus v. Crozier-Straub, Inc., 3 Cir., 1930, 41 F.2d 746; Holland Co. v. American Steel Foundries, 7 Cir., 1951, 190 F.2d 37; Ackermans v. General Motors Corp., 4 Cir., 1953, 202 F.2d 642.
 
 
 18
 We now pass to a comparison of the knitting methods respectively employed in the manufacture of the patented and the accused stockings, to determine whether the defendant's process is or is not sufficiently like that of the patent to constitute infringement.
 
 
 19
 Both stockings are made on full-fashioned knitting machines. It should be noted preliminarily that the parties agree and the court has found that it is a practical impossibility for yarn to be knit by these machines under no tension at all, for the guide wires over which the yarn is drawn, together with such other necessary devices as the miniscule beard openings in the needles, exert some unavoidable tension.
 
 
 20
 The evidence shows that both parties knit their stockings without the use of spring tension devices sometimes attached to full-fashioned knitting machines. In fact, the only tension exerted on the helanca as it is knit in the accused stocking, which is not exerted on Purcell's, is that tension incidentally gained from the use of an additional springless disc through which the defendant's "HELANCA" yarn travels, and also a "snarl eliminator." The latter appliance merely reverses the direction of the yarn three times as it passes through, and its primary function is simply to do that which its name implies, to prevent the yarn from becoming snarled.
 
 
 21
 While yarn tensions differ from time to time due to variable factors, tension, according to the defendant, usually varies from 1½ to 3 grams, 2 grams being regarded as normal tension. The defendant's evidence is that it uses only 3¾ to 4½ grams tension, and the record further shows that when the defendant's machines are run at low speeds, the tension is as little as 2½ grams.
 
 
 22
 According to the defense, the slight increase in tension is sufficient to stretch the "HELANCA" yarn in its finished fabric approximately ninety percent, possessing, in that state, stretch characteristics entirely different from the "HELANCA" yarn in the plaintiffs' fabric, and practically identical to the prior art stockings knit of rubber and inelastic nylon. In effect, the defendant argues the inferiority of its product, contending that it uses "HELANCA" yarn for the wide sales appeal of the trade name of this crinkled and set yarn. It insists that the "HELANCA" yarn in the accused stocking severely limits the capacity of the rubber to stretch.
 
 
 23
 The plaintiffs, on the other hand, point to the absence of spring tension devices in the defendant's knitting process, and urge that the difference in tension in the two knitting processes is minimal. The plaintiffs note that even in stockings knit with "HELANCA" yarn under 16 gram tension there is some stretch left in the "HELANCA" yarn. They further argue that even if the defendant increases tension in its process, the increase is without practical significance, for it still knits its "HELANCA" yarn in a sufficiently relaxed manner to enable the stocking to stretch to useful widths, thus following the art as taught by Purcell but attempting to disguise its appropriation of his essential process step.
 
 
 24
 Faced with a difficult decision on this very close issue, the Judge accepted the opinion of the defendant's expert witness that the defendant employs "heavy" tension in its knitting process, contrary to the teaching of Purcell. On this basis, the Judge decided that the accused stocking does not function in the same way as the patentee's, and he concluded that there was no infringement.
 
 
 25
 Since the trial, however, Scholl Manufacturing Co., Inc., sole distributor of the defendant's surgical stocking, has twice published, in widely read trade magazines, an advertisement of the accused stocking which contains statements material to the issue of infringement and which also bear pertinently on the credibility of the defense witnesses and the good faith of the defendant. This is made the subject of a motion by the plaintiffs in this Court for leave to present additional evidence to the District Judge.
 
 
 26
 Prominent in the advertisement is the boldly printed statement that the accused stocking is "the only kind that does not depend on all rubber yarn for elasticity." Apart from the admittedly false boast of exclusiveness is the clearly contradictory claim that something other than rubber, indisputably the "HELANCA" yarn, gives the stocking its elasticity. The advertisement asserts that the "HELANCA" yarn, provides elasticity. At the trial this was insistently denied and painstakingly sought to be refuted by the defendant. In listing the advantages of the "superior construction" gained through the use of "alternating * * * Helanca crimped nylon yarn," the advertisement states, "The alternating nylon threads prevent excessive stretching, assure firm, uniform support to all parts of the leg and foot." (Italics theirs.) Noteworthy is the fact that nowhere in the advertisement is the plain nylon mentioned, and this of course highlights its uselessness. Thus, the advertisement tends strongly to substantiate the plaintiffs' argument that the "HELANCA" yarn in the accused stocking is purposely knit with enough reduction in tension so that it functions, when used on a leg, in the same manner as the "HELANCA" yarn in the patented product. The plaintiffs maintain that by employing the process step of removing undue tension, the defendant infringes. It is because of this that the plaintiffs filed their motion to present additional evidence, and argument on the motion was heard with the appeal.
 
 
 27
 While advertising claims alone may not be sufficient to make out a case of infringement, cf., Motorfrigerator Co. v. Frigidaire Sales Corporation, 4 Cir., 1932, 59 F.2d 622 (although they may give rise to other causes of action), the Courts have in numerous instances relied on advertisements as admissions by the defendant of the infringing nature of the accused product. See, e. g., Potts v. Creager, 1895, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275; Gibbs v. Triumph Trap Co., 2 Cir., 1928, 26 F.2d 312; Schlicht Heat, Light & Power Co. v. Aeolipyle Co., C.C.S.C.N.Y.1902, 117 F. 299, 303; Wheatley v. Rex-Hide, Inc., 7 Cir., 1939, 102 F.2d 940, 942; University of Illinois Foundation v. Block Drug Co., D.C.E.D.Ill.1955, 133 F.Supp. 580. Particularly in a close case, such as this, should the District Judge be afforded an opportunity to weigh the additional evidence and to reappraise his findings in the light of it.
 
 
 28
 The defendant, Carolina Lee, argues, however, that only Scholl is responsible for the publication of the advertisement and that it should not be regarded as an admission by Carolina Lee in this case. It should suffice to say that Scholl has, to date, purchased the entire output of the accused stocking and that it is, itself, currently under suit for infringement in the Northern District of Illinois, and Rosedale is financing the defense in that case as well as this. Carolina Lee and Scholl being in substantially the same relation to the subject matter, the admissions of the latter are clearly evidence against the former. See, 4 Wigmore, Evidence (1940), Sec. 1069 et seq., p. 68 et seq. The precise participation, if any, by Carolina Lee in the advertisement, and whether Carolina Lee was the source of the information or material embodied in the publication, will, of course, be important in determining the weight properly attributable to the admissions.
 
 
 29
 This is a proper line of inquiry by the District Judge. As he has not had an opportunity to consider the additional evidence, we will not pass upon it in the first instance. Without affirming or reversing the judgment, the case will be remanded for the reception of the proffered testimony and for such additional evidence as the District Judge may think appropriate, and for his determination of the issues in the light of the amplified record.
 
 
 30
 Remanded without affirmance or reversal, for additional testimony.
 
 
 
 Notes:
 
 
 [1]
 Ischinger, the plaintiff's expert, further demonstrated the inconsistency in the plaintiff's position, when, in an affidavit filed in a companion suit against Scholl Manufacturing Co., Inc., in the District Court for the Northern District of Illinois, he stated:
 "* * * the statement in the Purcell patent specification `I knit this yarn under no tension' cannot properly, or logically, be interpreted to mean that the inevitable and always existent drag action on the yarn and the tension applied to the latter by the action of the sinkers and dividers, is to be somehow eliminated in this instance and the Helenca yarn somehow placed in straight-line formation adjacent the needles while relaxed and so maintained throughout the loop and course-forming operation. Rather, it might mean that the use of the usual, standard or conventional tension devices may preferably be dispensed with. [Italics Ischinger's.]
 * * * * *
 "* * * it is not necessary to the practice of the Purcell invention that the Helanca yarn be more than fully stretched in connection with its transformation into loops and courses by the knitting machine, and this is accomplished without the use of usual tension devices, as clearly developed by the testimony of the inventor Purcell in his deposition filed herewith, and in the manner above explained." (Italics ours.)