## FLORIDIN CO. v. ATTAPULGUS CLAY CO. et al.

### No. 1247.

District Court, D. Delaware.

Nov. 19, 1940.

John J. Darby and George W. Porter (of Cushman, Darby & Cushman), both of Washington, D. C., George P. Dike (of Dike, Calver & Gray), of Boston, Mass., and Hugh M. Morris and S. Samuel Arsht, both of Wilmington, Del., for plaintiff.

Merrell E. Clark and Paul R. Ames, (of Fish, Richardson & Neave), both of New York City, T. Wallace Quinn, of Philadelphia, Pa., and Herbert L. Cohen, of Wilmington, Del., for defendants.

NIELDS, District Judge.

This is a patent infringement suit brought by Floridin Company, plaintiff, a Delaware Corporation, against Attapulgus Clay Company and Attapulgus Clay Sales Corporation, defendants, Delaware corporations. Plaintiff charges defendants with infringement of United States Patent No. 2,079,854 for "Process for Treating Naturally Active Earth and Product Thereof" issued May 11, 1937, to Frank W. K. Hartshorne, assignor to Floridin Company, on application filed August 27, 1936. Upon plaintiff's motion the bill of complaint was dismissed as to Attapulgus Clay Sales Corporation, the second defendant. The defenses are invalidity and noninfringement.

Plaintiff has an office in Warren, Pennsylvania. It operates mines in Northwest Florida, near Quincy. Since 1910 it has processed fuller's earth and sold the earth primarily for decolorizing mineral oil. Defendant has an office in Philadelphia, Pennsylvania. It owns mines at Attapulgus, Georgia, about twenty miles from plaintiff's plant. Since 1920 it has processed fuller's earth at the mines.

Fuller's earth is used to adsorb excess moisture as well as to decolorize oil. Oil as it comes from the ground is very dark. In refining oil it is necessary to remove some of this color and improve its appearance and its physical properties. Plaintiff and defendant compete in the processing and sale of fuller's earth for decolorizing oil. The name "fuller's earth" is derived from its first use which was to remove grease from woolen cloth in the process of "fulling" or shrinking. It is no longer used for this purpose in the United States, where approximately 98% of all fuller's earth is sold for decolorizing oil.

Prior to the use of the process alleged to be covered by the patent in suit the preparation of fuller's earth was a process of removing excess moisture and reducing the earth to the most effective size for decolorizing purposes. After the fuller's earth was mined it was permitted to dry for a few days and then crushed to lumps of less than one inch in size. Thereafter it was dried in a rotary kiln to reduce the moisture. It was further reduced by grinding rolls and screened to the required size. The value of fuller's earth depends upon its decolorizing efficiency. This in turn is determined by the volume of oil a given quantity of fuller's earth will decolorize to a given color value.

The essence of both plaintiff's and defendant's process is the use of extrusion. Plaintiff began extruding fuller's earth as a feature of its process before defendant. It started this feature to improve the adsorptive efficiency of fuller's earth before the issuance of the patent in suit which occurred in May, 1937. In the summer of 1936 defendant found that the fuller's earth sold by plaintiff, its principal competitor, possessed increased adsorptive efficiency. It was curious how this increase was obtained.

Defendant learned that plaintiff had an extrusion machine at its plant and assumed that plaintiff obtained its improved result by passing the earth through such a machine. Defendant verified this assumption by tests upon available meat grinder extrusion machines. It found the adsorptive efficiency of fuller's earth could be improved substantially by passing it through such machines. This result was obtained from extrusion machines which were manufactured by others than the manufacturer of plaintiff's machine and before defendant knew who that manufacturer was.

As a result, defendant decided it would like to use such a machine in the treatment of its fuller's earth if the patent situation permitted. A patent search followed. The Hartshorne patent had not then issued so defendant's patent search did not disclose that plaintiff had any patent rights. However, defendant found Ikeda United States patent No. 1,630,660 which had issued about ten years earlier in May, 1927. Ikeda patent disclosed the earth extrusion process which defendant desired to use. Defendant immediately negotiated for its purchase and acquired it. Defendant then ordered the extrusion machine used in its process from an extrusion machine manufacturer other than the one from whom plaintiff obtained its machine. In fact defendant's machine is of a different type from plaintiff's. It is a double-screw, not a single-screw, machine. All this occurred before the issuance of the Hartshorne patent which plaintiff asserts is infringed by defendant's use of its extrusion machine.

### Patent in Suit.

The Hartshorne patent in suit has to do with a single step in the preparation of fuller's earth for use as an adsorptive agent. This step consists in extruding moistened fuller's earth through holes in a die plate. More simply stated, the step consists in running properly moistened fuller's earth through a machine of the same general type as an ordinary kitchen meat grinder. The purpose and result of this step is to increase the adsorptive efficiency of the earth. The remainder of the process described in the Hartshorne patent follows standard practice long used in the preparation of fuller's earth for use as an adsorptive agent.

To insure that the extrusion will impart to the earth "appreciable" improvement in efficiency "of the order of 10% or higher", the Hartshorne patent teaches that the size of the holes in the die plate should be one-eighth to five-eighths of an inch

in diameter and that "the plasticity or fluidity of the mass" should result from a "free moisture content * * * of from 45 to 55%". Translated into terms of pressure on the die plate, Hartshorne says that this condition will give a minimum die plate pressure of 100 pounds per square inch, and that this is sufficient. He also says that he has "not found any maximum pressures which are harmful". There is nothing critical or unusual in the fact that the die plate pressure existing in the extrusion described by Hartshorne is in excess of 100 pounds per square inch. It would be unusual if it were less than that.

Why the grinding of earth in a meat grinder increases its adsorptive efficiency is still in the realm of theory. It seems clear, as Hartshorne says, that the operation effects "a change in the physical structure" of the fuller's earth and that this change involves an increase in the porosity of the earth and makes accessible to the fluid treated a larger area of internal surface. Adsorption being a surface phenomenon, the greater the total surface area accessible to the fluid being treated, the greater will be the adsorptive capacity of the earth.

Hartshorne claims, relied upon by plaintiff as typical, are claims 3, 6, 8, 10, 11 and 16. Claims 6 and 10 are illustrative:

"6. As a new article of manufacture, fuller's earth in granular-like form which, containing a suitable portion of its natural combined moisture, has been subjected to extrusion while under a pressure on the material sufficient to increase its adsorptive capacity from 10% to 40% as compared to the same earth which has not been extruded."

* * * * *

"10. The improved process of treating a naturally active earthy decolorizer, such as fuller's earth, which consists in subjecting the same in plastic form and while retaining combined moisture in excess of 2% to flow under pressure in excess of 100 pounds per square inch whereby to increase its adsorptive capacity in excess of 10% as compared to the same earth which has not been subjected to pressure."

The simple step of passing the earth through a meat grinder is expressed in the words "subjecting the same in plastic form * * * to flow under pressure in excess of 100 pounds per square inch." The clause "while retaining combined moisture

in excess of 2%" is the most important part of claim 10.

The inclusion of that clause in this claim and similar clauses in the other typical claims was responsible for the allowance of these claims by the Patent Office over the Ikeda patent. The water chemically combined in the clay is called "combined moisture". The combined moisture in the Florida fuller's earth as mined averages from 9 to 14% by weight. In addition to this combined moisture fuller's earth as mined holds within its pores a comparatively large amount of water which it has adsorbed from the elements. It can be removed by heating the clay to temperatures not exceeding the boiling point of water. To remove "combined moisture" involves the breaking down of the chemical structure of the earth and requires higher temperatures. Hartshorne patent states: "By 'combined moisture', I mean moisture which is held in chemical combination and is given off by the clay only when subjected to temperatures above 212° F."

All of the other typical Hartshorne claims contain the same or similar clauses. In claim 11, the clause is the same as in claim 10. In claim 8, "not less than approximately 6%" is substituted for "in excess of 2%" with regard to the amount of combined moisture which must be retained. In claims 3, 6 and 16 no figure is given but the statement is merely that a "part" or "a suitable portion" of the combined moisture is retained.

By reference to the Ikeda patent none of these expressions distinguishes the claims from the disclosure of that patent. There is not even a suggesion in the Ikeda patent of the futile dehydrating step which Hartshorne attributes to it. On the contrary, Ikeda states that the first thing done to the earth is to add water to it to adjust the total water content to the desired amount.

Ikeda Anticipates Hartshorne.

There are two Ikeda patents: United States Patent No. 1,630,660 of 1927 and the Japanese patent of 1922.

Like Hartshorne, Ikeda was interested in fuller's earth. Each was particularly interested in a preparatory treatment which would impart to the earth high efficiency as an adsorptive agent. Like Hartshorne, the treatment which Ikeda prescribed for this purpose was extrusion of the earth, after it had been properly moistened.

The first two paragraphs of United States Ikeda patent are:

"This invention has reference to a method of preparing an adsorpting agent preferably though not necessarily adapted for use in drying air.

"The object of the invention consists in the method of treating acidic clay such as fuller's earth, Florida earth or charcoal and like porous materials so as to render the finished product highly efficient in adsorpting moisture from the air."

The particular adsorptive use which Ikeda suggests for his extruded fuller's earth is the removal of water from air. Ikeda makes it clear that he contemplated other uses. The most common and obvious use for fuller's earth is for decolorizing oil.

Hartshorne's supposed invention does not reside in any novel use of fuller's earth but in preparing it for use. The difference in the statements of the two patentees regarding their preferences as to the adsorptive uses to which their extruded fuller's earth may be put is not significant.

Ikeda's description of his extrusion process for increasing the efficiency of fuller's earth parallels Hartshorne's in every respect. It points out that the first thing done to the fuller's earth is to knead it with a regulated amount of water in order to give it the proper degree of plasticity. It suggests suitable percentages of total water content for this purpose. It states that the earth in this condition is extruded. It gives appropriate "aperture" sizes.

Ikeda United States patent says:

" * * * in carrying out the process the acidic clay is first kneaded with water.

"The acidic clay is first kneaded with water, the amount of which is so regulated that there is 80 to 110 parts of total water to 100 parts of completely dehydrated clay. The kneaded mass has now acquired the proper degree of stiffness. It is now pressed through aperture 1 of appropriate size, for instance, of 3 to 10 millimeters [1/8 to 3/8 inches] in diameter in the bottom of the cylinder 2."

United States Ikeda patent does not describe the kind of extrusion machine used but the corresponding Japanese patent states that the kneaded mixture is "extruded by a spiral extruding apparatus" which means the meat grinder type.

Ikeda's extruded material is dried like Hartshorne's. It is left in the form of short lengths of rods one-eighth to three-eighths inches in diameter, for the air drying use to which it is "preferably though not necessarily" to be put. Thus Ikeda discloses completely the substance of Hartshorne's supposed invention and all his claims.

Ikeda did not dehydrate the fuller's earth before adjusting its total water content. In Ikeda's statement that the amount of water is "so regulated that there is 80 to 110 parts of total water to 100 parts of completely dehydrated clay", the expression "completely dehydrated clay" is used merely to indicate the basis upon which the total water content is to be calculated. It is clear that the amount of total water stated is intended to include the "combined moisture" as well as the "free moisture".

Ikeda's statement does not suggest that the step of kneading the clay with water to increase its total water content is preceded by a drying step of any kind, much less by "complete dehydration" as stated in the Hartshorne patent. On the contrary, the specification makes it clear that the step of kneading the earth with additional water is the first step to which the earth is subjected in the Ikeda process. All of the water already in the earth is left there. Only sufficient water is added to bring the total water content up to the amount prescribed.

Both of the Ikeda patents show Ikeda's realization of the deleterious effect of dehydration upon the adsorptive power of the earth. Like Hartshorne, Ikeda found it necessary to subject the extruded earth to a drying step in order to give it the required rigidity. In referring to this post-extrusion drying step, Ikeda warns that one should not use "too high a temperature nor subject the same to a long period of heating, because the adsorptive power is thereby impaired". The Japanese Ikeda patent makes a similar statement but goes into it in much greater detail. In view of this it would be absurd to construe other portions of the Ikeda disclosures as meaning that the earth should be completely dehydrated before extrusion.

The allowance of the Hartshorne claims over Ikeda was obtained as a result of misrepresentations to the patent office, i. e., that the Ikeda process would not work unless the earth was substantially completely dehydrated before extrusion. The Hartshorne application contains substantially the same statements about the Ikeda pat-

ent that are contained in the Hartshorne patent. Many of the claims of that application contained the same clause about the retention of more than 2% of combined moisture in the earth before extrusion. Hartshorne knew of the Ikeda patent at the time he prepared his application. He then sought to dispose of Ikeda as a reference by contending that Ikeda contemplated complete dehydration of the earth. In his application, as in the patent, he used the expression "substantially completely dehydrated" to define earth which did not retain more than 2% combined moisture.

In his first action upon the Hartshorne application the Patent Office Examiner rejected all of its claims upon the Ikeda United States patent. In his rejection the Examiner said: "The usual combined water content of fuller's earth is considerably above 2%. The statement in the [Ikeda] patent 'completely dehydrated clay' is merely an indication of the basis of calculation of the proportion of water added. It is fundamental in the adsorbent clay art to avoid complete dehydration."

Hartshorne not only denied this interpretation but in support of his denial filed an affidavit by FitzSimons, chief chemist of the plaintiff company. In his affidavit FitzSimons states his agreement with Hartshorne's interpretation of the Ikeda patent by saying that: "The [Ikeda] patent states that 'completely dehydrated clay' is used and that to the same a regulated amount of water is added."

FitzSimons further states: "My tests were conducted with Florida earth to which the [Ikeda] patent particularly refers and this is the type of earth which the Floridin Company mines and processes. Such earth contains a substantial amount of natural moisture and I have found that unless it is dehydrated substantially completely, the serrated or special formation described by Ikeda is not obtainable when the earth is rewetted and forced through an orifice as described by the patent."

This was a representation that there was a crucial difference between Hartshorne and Ikeda. The Examiner accepted these sworn statements as true and allowed the Hartshorne claims.

It now appears from FitzSimons' test sheets which he did not furnish to the Patent Office and also from his testimony in this case that the tests to which FitzSimons refers actually gave results exactly opposite to those stated by him in his affidavit.

■ The affidavit states that his tests showed that extruded rods having surfaces as disclosed by Ikeda can be produced only by the use of earth which has been substantially completely dehydrated. The tests on the other hand demonstrate that extruded rods having such surfaces can be produced by the use of earth which has not been substantially completely dehydrated and that that is the only way in which they can be produced. According to FitzSimons' affidavit, Ikeda patent must have meant that the earth was completely dehydrated. According to his tests the Ikeda patent could not have meant any such thing. The presumption of validity of the Hartshorne patent is destroyed because the Patent Office was induced to allow the Hartshorne patent over the Ikeda patent by misrepresentations regarding the process disclosed in the Ikeda patent.

### Infringement.

■ Little need be said on the question of infringement. The record fully establishes that defendant's process follows the prior art disclosure of the Ikeda patents. Defendant, like Ikeda, treats fuller's earth to increase its adsorptive efficiency by extruding it in a meat grinder type of extruding machine. Defendant takes nothing novel from the later Hartshorne patent. It is fundamental that if defendant's process or machine is substantially identical with the prior art there can be no infringement.

### Conclusions of Law.

■ 1. The Hartshorne claims in suit are invalid because anticipated by the Ikeda patents.

2. The Hartshorne claims in suit are invalid for lack of invention over the Ikeda patents.

■ 3. Defendant does not infringe any of the claims in suit.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c.

The complaint must be dismissed.