**TRIUMPH HOSIERY MILLS, INC., Hudson Hosiery Company, Burlington Industries, Inc., Claussner Hosiery Company, and McCallum Hosiery Company, Plaintiffs,**

v.

**ALAMANCE INDUSTRIES, INC., Kayser-Roth Corporation, and Kayser-Roth Hosiery Company, Inc., Defendants.**

No. C-232-G-58.

United States District Court
M. D. North Carolina,
Greensboro Division.
Feb. 10, 1961.

John W. Malley and Carl G. Love, Washington, D. C., Thornton H. Brooks and David Rabin, of Greensboro, N. C., for plaintiffs.

Paul B. Bell and Charles B. Park, III, Charlotte, N. C. and Welch O. Jordan, Greensboro, N. C., for defendants.

HAYES, District Judge.

The plaintiffs instituted this suit for a declaratory judgment praying for a decree that Patent No. 2,841,971 to Joseph J. Bird, et al. on a compressive stocking be declared invalid and non-infringed, and that the plaintiffs have a decree against the defendants from interfering with the plaintiffs in the manufacture of their stockings or their customers who sell them. The defendants in answering alleged the validity of the patent, accused each of the plaintiffs with infringing the patent, asked for an accounting, and in their counterclaim the defendants set up another cause of action against Burlington and Claussner-McCallum, alleging unfair trade practices and praying damages therefor.

The application for the Bird Patent was filed on August 19, 1957, and the patent issued July 8, 1958. There was no interference filed against the issuance of the patent and on motion of the patentees, action on the application was advanced, and upon consideration of the same the Examiner rejected all claims of the patent on March 12, 1958. The patentees made substantial amendments April 2, 1958, May 5, 1958, and May 8,

1958, which resulted in the allowance of Claims Nos. 18, 20, 21, 22, 23 and 24.

The object of the invention was to provide an all-nylon stocking which would serve the purpose of the surgical stockings which were well known and which had been marketed for years. But it was desirable to produce a stocking without the objections which had arisen to the surgical stockings. They were made of rubber and sold in drug stores and special stores, ordinarily when prescribed by the medical profession, especially in cases of severe varicose veins. An improvement over the rubber stocking occurred in a patent issued to Purcell on March 1, 1955.[1] It was thought in that case that the Purcell patent taught how to make a stocking of the surgical type by utilizing a strand of rubber covered with nylon and a strand of helenca (nylon crimped and heat set), thereby adding to the beauty of the stocking by giving it a sheer appearance and overcoming the objections to the unsightly appearance of the all-rubber surgical stocking.

Neumager in Patent No. 2,641,914, dated June 16, 1953, taught the use of helenca alone for making the stocking. While this stocking afforded the expansion, it was weak in retraction. The Purcell Patent failed to absorb the demand for this type of stocking. By reason of the state of the art, as disclosed by the patents herein referred to, the patent to Bird is at most an improvement over the state of the art rather than a pioneer patent in its field. While the Bird Patent is entitled "Compressive Stocking," this invention relates to a knit stretchable and retractable garment fabric, particularly hosiery, the stitch loops of which are knit of multiple monofilament synthetic torque yarns to form a stocking which has sufficient compressive or binding force on the leg to be of therapeutic value to the wearer.

In describing the invention and the state of the art, it is said: "Stockings having a satisfactory high compressive or binding force on the leg of the wearer have depended upon the inherent elasticity in the yarn or thread of which the stockings were knit. Some of these so-called 'surgical' stockings have been knit throughout with an elastic (rubber), or elastic covered yarn, alone or in combination with plain yarn or crimped or curled synthetic stretch yarn. While some of these prior types of elastic stockings provide sufficient compressive force on the leg of the wearer, they are not as attractive as conventional monofilament stockings. Also, the prior elastic stockings which utilize rubber threads cause some people to have skin reactions and such stockings rapidly deteriorate with age and washings. Stockings made of crimped or curled synthetic stretch yarn do not have enough compressive force to be of any appreciable therapeutic value.

"Other types of stretchable and retractable stockings are currently being produced from various types of curled, crimped or torque nylon yarns, but such stockings are produced to fit a wide range of leg and foot sizes without any intention of compressing or binding the leg. Such stockings have a great amount of stretchability and are relatively easy to stretch so that the hose will not bind the leg of the wearer but will merely fit snugly.

"The compressive stocking of the present invention differs from prior stretchable stockings knit with crimped or torque yarns, since the stocking of the present invention has a high resistance to stretch and, therefore, a strong tendency to return to its normal relaxed position. The present compressive stockings are of particular therapeutic value to persons suffering from pathological conditions in the vascular system of the legs such as often occur during pregnancy.

"It is the primary object of this invention to provide a highly compressive stocking, the stitch loops of which are knit of a plurality of inherently inelastic synthetic yarns, each of which has been twisted to impart high torque thereto.

1. Johnson & Johnson [and Purcell] v. Carolina Lee Knitting Co., 155 F.Supp. 414, Id., 4 Cir., 258 F.2d 593, re-hearing 173 F.Supp. 73, affirmed 4 Cir., 1960, 275 F.2d 91.

The torque yarns in the stitched loops cause the loops to deform or incline when the stocking is relaxed and when stretched the stitch loops will straighten. The use of multiple high torque yarns in the stitch loops will multiply the resistance of the deformed stitch loops to straighten and produce a stocking which has a high resistance to stretch and, therefore, a strong tendency to return to its normally relaxed or unstretched condition resulting in a much higher degree of compression, constrictive or binding force on the leg of the wearer than has heretofore been obtained with torque yarns."

Burlington had been making a similar stocking and it had been sold over the United States extensively for more than a year before the application for the Bird Patent was filed. This Burlington stocking was constructed with three strands of 15 denier torque nylon yarn on conventional machines and in the conventional loops which was stretchable and retractable, but this was nowhere cited in the application nor in the subsequent presentation before the Examiner in the Patent Office and this has an important bearing on the whole subject matter of this litigation. In the footnote below,[2] a proper understanding of the problem is set forth

**2.** **Bird Patent**
Filed August 19, 1957

In knitting the stocking blank a standard full-fashioned knitting machine is used.
—Col. 3, line 44–5.

The boot of Leg 12 of the blank is made with one carrier, feeding the Z torque yarns, making two courses, and

The other carrier, feeding the S torque yarns, making the next two courses and alternating throughout the length of the remainder of the stocking blank.
—Col. 3, lines 66–70.

Stipulated Facts of Burlington
Style 964, Sold in 1955

13 d. The Burlington stockings described—in 13 c.—were knit using the two carrier system on a conventional full-fashioned knitting machine.

Three-end stockings were knit using three unplied ends of "S" twist heat-set torque monofilament nylon yarns fed through one carrier to knit two courses in the Fabric and

Three unplied ends of "Z" twist heat-set torque monofilament yarns were fed through the other carrier to knit two courses in the fabric.

The sequence of alternation of yarn carriers was carried out for the knitting of the boot of the stocking.

By using plural unplied high torque yarns of the same torque direction in each course with each of said yarns being free and movable independently of the other, greater compression is obtained due to the combined independent action of each yarn tending to distort the fabric loops and draw up the stocking. This combined torque reaction results in a highly compressive fabric heretofore unobtainable without the use of rubber yarns.
—Col. 3, lines 10–17

It is thus seen that we have provided a highly compressive stocking, utilizing no rubber, by knitting a plurality of, at least three, independent high torque yarns in each loop of the knitting stocking.
—Col. 6, lines 57–60

13 c. The three-end full-fashioned stockings were made of three ends of torque 15 Denier monofilament nylon yarns, three ends each having 15 turns per inch of "S" twist unplied in alternate courses and three ends each having 15 turns per inch of "Z" twist unplied in intervening courses. This stocking was, and is, Burlington Style No. 964. Burlington commenced the manufacture and sale of these stockings in June, 1955.

in parallel columns. The left column describes the Bird Patent while the right column stipulates the Burlington stocking.

The conduct of the patentees with respect to the Burlington stocking constitutes one of the main arguments of the plaintiffs for declaring the patent invalid. While other prior art is pleaded, and prior publications, the plaintiffs have relied on the Burlington stocking as constituting the best prior art. Although the file record discloses a rejection by the Patent Examiner of all the claims as being unpatentable over Weller No. 2,755,-616, in view of Tait, No. 2,636,369, who shows that it is old to knit a plurality of monofilament into a stocking. Weller knits alternating courses of opposite torque so as to produce a balanced fabric. It was held "obvious that one skilled in the art desiring to produce a fabric with a greater resistance to stretch, would realize that this would be obtained by using a plurality of filaments in lieu of a monofilament. Hence it would not be inventive to knit a plurality over monofilament in each course of Weller since this is shown to be old in Tait and the results obtained therefrom would be obvious and expected."

On April 3, 1958, substantial amendments were made to the claims to which Neumager No. 2,641,914 was made reference. The method claims were rejected as were Claims 22 through 24 as being unpatentable over Weller in view of Tait. On May 3, 1958, further amendments were filed of a substantial nature, resulting in new Claims 21, 22, 23 and 24. Again amendments were made on May 8, 1958, for the purpose of pointing up and defining the invention and particularly to specify the plurality of independent torque yarns, at which time the patentees and their attorney appeared before the Examiner for the purpose of demonstrating their invention over the prior art, including the Knohl Patent No. 2,832,-125. Braxton and Comer, two of the patentees, with their attorney, appeared before the Examiner for the purpose of

demonstrating their invention over the prior art, and at which time the claims were made more definite by the addition of "there being at least three yarns in some courses for a torque in one direction and at least three yarns in other courses for a torque in opposite directions," in Claims 8, 9, 10, 11, and the same clause, except "four" was substituted for "three" was added to Claims 12, 13, 14, 15 and 17. In this connection, the file record excludes any reference whatever to the Burlington stocking having been brought before the Examiner, and yet the Burlington stocking in its structure and result read more nearly on the Bird patent than any of the references or structures demonstrated before the Examiner. This was not omitted by inadvertence or neglect. Its omission was deliberate and resulted in the concealment from the Examiner of facts definitely known to the patentees because Bird on March 31, 1958, wrote the patent attorney:

"It is suggested that we list four ends of 15 denier monofilament yarns in each loop as being the minimum and not set up a definite maximum * * *. The consideration for specifying a minimum of four ends is on the basis that Burlington and others have been making a service-weight stocking under the Patentex Chadolon Patent and to make our claims identifiable we should specify more than three ends. Otherwise there could be the question that Burlington and others had been making a stretch stocking with three ends of yarn which would serve the same purpose."

There is no doubt in my mind that the claims would not have been allowed over the Burlington stocking if the patentees had performed their duty of making a true presentation of the state of the art at the time of the demonstration. Having demonstrated the weakness of the one strand method and the two strand method over their four strand on which they sought the patent, there is no

other conclusion to reach than that they deliberately omitted demonstrating the Burlington stocking with full knowledge that it constituted the present prior art over the stocking on which they sought their patent. This conclusion is buttressed by the fact that the amendments to their claims, which have been referred to above, indicate that they knew of the significance of three strands and four strands in connection with their invention. In Armour & Company v. Wilson & Company, D.C., 168 F.Supp. 353, 359, the court held:

> "The Thompson patent was secured after furnishing the Patent Office with false and misleading evidence and statements, and this invalidates the Thompson patent. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 816, 818 [65 S.Ct. 993], 89 L.Ed. 1381, 1387, 1388; [65 USPQ 133, 138, 139;] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238 [64 S.Ct. 997], 88 L.Ed. 1250, [61 US PQ 241;] Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240 [54 S.Ct. 146], 78 L.Ed. 293, [19 USPQ 228;] Florindin [Co.] v. Attapulgus Clay Co., D.C.D.Del.1949, 35 F.Supp. 810, 814, [47 USPQ 332, 336]."

In view of the three weeks consumed in hearing the testimony and argument in the case, the court will consider other aspects and issues which have arisen. In the event that the invalidity of the Bird patent is not sustained on the basis of willful withholding from the Patent Office vital information on the invention and magnifying the inadequacy of the art at the time, we pass to the question of the patent itself as well as the validity of the claims and the matter of infringement.

The patent is confined to a specific product and if limited to its proper definitions embodies a structure not then known and is an improvement over the structure theretofore produced. The novelty, if any, resides in a structure of highly repressive force, demonstrated in the patent as "compressive," which possesses substantially more resistance to stretch and greater power of restriction or compression than any of the structures heretofore made without elastic. If interpreted in the light of its specifications and Charts I, II and III, illustrating the same, the stocking, in order to comply with the invention, is required to achieve the force of restriction demonstrated in Chart I. The stockings made and sold by defendants since the fall of 1957 have been made in accordance therewith and have been given widespread approval both by the consuming public and by the medical profession who have recommended its use in preference to the elastic stocking. It was marketed by Kayser-Roth under the trademark "Supp-hose" and designated as a "Support Stocking". It distinctly differed from a rubber stocking in that rubber after being stretched snaps back, whereas the nylon stocking constituting the invention was stretchable and retractable by virtue of the torque in the yarns and in the loops, thereby importing a liveliness thereto which caused the stocking to retract with force or compression. Its novelty over the Burlington stocking resides in its excess of repressive force which arises by the use of four ends of 15 denier, giving a total of 60 denier, which until their invention was deemed impractical, unsatisfactory and too heavy to be accepted by the consumers. In addition to the statutory presumption of validity, 35 U.S.C. § 282, which was enacted after Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983, the importance of which statute is considered in Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 258 F.2d 124, the patent in suit meets other tests by:

(1) It solved a long-existing problem and filled a long-felt need. Baker Cammack Hosiery Mills et al. v. Davis Co., 4 Cir., 181 F.2d 550.

(2) The substantial commercial success enjoyed by the "Supp-hose" Compressive Stocking attests its merits.

Baker-Cammack Hosiery Mills et al. v. Davis Co., supra; City of Grafton W. Va. v. Otis Elevator Co., 4 Cir., 166 F.2d 816; Kress & Co. v. Aghnides, 4 Cir., 246 F.2d 718.

(3) Royalties paid by others in the field, to-wit, $700,000 a year in foreign licenses and $400,000 a year by Hanes Hosiery.

(4) The imitation by the competitors of the Bird stocking. It is significant that although the plaintiff had rejected such a stocking before the Bird patent that promptly thereafter they resorted to the manufacture of a stocking comparable to weight composed of either four ends 15 denier or 3 ends 20 denier which served substantially the same function of the stocking described in the patent. It was said in Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277, 281:

"The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think."

This principle is supported in Black & Decker Manufacturing Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910; Ackermans v. General Motors Corp., 4 Cir., 202 F.2d 642, and Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F. 2d 587, 596. It is contended by the plaintiffs that the advance to the patented stocking over the prior art was a mere matter of degree obvious to one skilled in the art and not patentable. But this argument is not impressive nor in accord with Stedman Mfg. Co. v. Redman, 4 Cir., 257 F.2d 867; O. M. I. Corp. of America v. Kelsh Instrument Co., Inc., 4 Cir., 279 F.2d 579 and Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. It is noteworthy that Burlington ceased production of its three-end stocking during 1957, but revised it in 1958, and in 1959, after this suit had been instituted, it began the production of three-end 20 denier. This is rather significant, as pointed out in this circuit in Procter & Gamble Mfg. Co. v. Refining, Inc., 4 Cir., 135 F.2d 900.

Defendants concede that the Burlington three-end 15 denier stocking does not infringe the Bird patent. This is not any generosity on their part. It is rather a concession necessary to avoid invalidating the patent on account of prior art and to afford a semblance of excuse for failure to bring it to the attention of the Patent Office.

■ Claims 1 through 7 are held invalid for lack of definiteness and anticipated by Burlington's three-end 15 denier stocking. Claims 8 and 12, directed to the knee portion of the stocking, Claims 9 and 13, directed to the ankle portion, Claims 10 and 14, directed to the instep portion, and Claims 11 and 15, directed to the foot portion, are sufficiently specific and are held valid. Claims 16, 17 and 18 are held sufficiently definite and valid. Claims 19 and 20 are held invalid for indefiniteness. Claims 21, 22, 23 and 24 are held sufficiently definite and valid.

■ In holding the claims above valid, the court became constrained to do so on the basis of the specific improvement in the production of the desired stocking over the prior art and made according to the specifications and limited to the precise form and elements to produce the highly compressed stocking. In holding the claims valid, the court arrived at the difficult determination on the narrow basis that the patented stocking was a valuable improvement over the prior art, if strictly construed according to the definitions set forth in the claims which have been held valid. Stockings made of a less specified standard and possessing less highly compressive force would not be construed to come within the terms of the claim. It is not such a pioneer in its field that others making stockings of a lower degree of compression would have to pay tribute and for this reason should be classified as a secondary invention. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Com-

pany, 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527; Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 139 F.2d 633; Hutzler Bros. Co. v. Sales Affiliates, Inc., 4 Cir., 164 F.2d 260.

█ █ It is a settled principle of patent law that the invention is measured in terms of the claims, but that the claims "are to be read, interpreted and applied in light of the specifications which may not enlarge a claim but which may explain and clarify it."

█ Burlington's accused stocking of three-end 20 denier infringes Claims Nos. 8, 9, 16, 21, 22, 23 and 24 of the Bird Patent. Its stocking has the same weight and substantially the compressive force specifically set forth in those claims. The accused stockings made by Claussner-McCallum and Hudson infringe Claims Nos. 13, 16, 17, 21, 22, 23 and 24. Plaintiff Triumph knitting the three-end 20 denier high torque monofilament nylon infringes Claims Nos. 8, 9, 16, 21, 22, 23 and 24 of the Bird Patent.

█ The court holds that none of the plaintiffs willfully and deliberately infringed the patent but acted in good faith in the honest belief that as licensees of Patentex they had the right to make their stockings and were so advised by counsel. In no event should the plaintiffs be required to pay treble damages.

### Misuse of Patent

The lease agreement between defendants and Hanes Hosiery Mills Company contains provisions which clearly restrict the licensees from making or selling support stockings in competition with the owner of the patent. The patent confers no monopoly to the patentees for the exclusive manufacture of a support stocking or the right to prevent anybody from making or selling a stocking with its qualities such as the two-end 15 denier stocking made by some of the plaintiffs before the issue of the patent, and particularly the three-end 15 denier support stockings made by Burlington Mills. In this connection, it is to be remembered that the defendants are asserting the exclusive use to the word "support" as descriptive of a stocking when they knew full well that the two-end and three-end nylon stockings made by the plaintiffs had support characteristics, but for reasons convenient to the defendants they described them as "stretch" stockings.

In Paragraph 2(a) licensee agrees "it will not manufacture, sell or distribute any support stockings for women except in accordance with the terms of this lease. Licensee agrees it will not represent any stockings to be support stockings for women except stockings manufactured under this license."

Paragraph 2(b) contains this provision: "All support stockings for women manufactured * * * by licensee shall possess * * * compression characteristics explained in United States Letters Patent No. 2,841,971. A stocking constructed of one or two-end 15 denier stretch nylon yarn in boot and foot shall not be considered within the scope of this license agreement, and licensee may manufacture, sell and distribute stretch stockings and royalties shall not be applicable thereto."

█ In connection with the excerpts of the preceding, one clearly shows that the licensor was extending his monopoly beyond that conferred by the patent and was endeavoring to prevent licensee from making a stocking of one or two-end 15 denier stretch nylon yarns. The exclusion clause restricted to the one and two ends of 15 denier clearly indicates that the contract prevents licensee from making any stocking and referring to it as a support stocking and requiring him to refer to it as a stretch stocking instead. It follows from what has been said that the patentee is using the lawful monopoly granted by the patent as a means of suppressing the manufacture and sale of competing unpatented articles and is endeavoring to extend the bounds of its lawful monopoly to give it the exclusive market for every support stocking when the patent does not extend that far. This practice is unlawful. National Lockwasher v. George K. Garrett Co., 3 Cir., 137 F.2d 255; McCullough v.

Kammerer Corp., 9 Cir., 166 F.2d 759; Cf. Chiplets, Inc. v. June Dairy Products, D.C., 89 F.Supp. 814; Steffen v. W. J. Schoenberger Co., D.C., 90 F.Supp. 710; F. C. Russell Co. v. Consumers Insulation Co., 3 Cir., 226 F.2d 373; United Shoe Machinery Co. v. United States, 258 U.S. 451–458, 42 S.Ct. 363, 66 L.Ed. 708.

The language of the instant license agreement differs from that construed in North Drive-In Theatre Corp. v. Park-In Theatres, Inc., 10 Cir., 248 F.2d 232; United Lens Corporation v. Doray Lamp Co., Inc., 7 Cir., 93 F.2d 969, and Carter Products v. Colgate-Palmolive Company, D.C., 164 F.Supp. 503, which are cited by the defendants. The misuse of the patent requires a court of equity to leave the defendants without equitable relief, either for an accounting, or by way of injunction.

On the counterclaim of the defendants against Burlington and Claussner-McCallum for unfair trade and use of good will of defendants on the charge of copying its advertising material, the defendants have failed to show by a preponderance of the evidence that either of these plaintiffs has engaged in unfair practice or wrongfully used the defendants' trademark on advertising matter. It is true that in some respects there are close similarities between the advertising of the plaintiffs and that of the defendants, but the proof is wholly insufficient to establish by a preponderance of the evidence that any customers of the defendants were misled or confused. It is incumbent on the defendants to produce adequate proof that it has been damaged by the use of its material. The bulk of the evidence offered by the defendants relates to the pictures of women wearing stockings and of the functions which the stockings render to the leg of the wearer. However, the pictures employed and the language descriptive of the product truly illustrate the product of the plaintiffs. The defendants cannot properly exclude the plaintiffs and others from displaying stockings on the legs of a woman regardless of the pose in which she is portrayed. Moreover, Burlington in its advertising has distinctly exhibited its name as the producer of its stocking in bold letters which should distinguish it from the product of the defendants. In like manner Claussner-McCallum prominently and in bold letters designate their stocking as "Comfo", which definitely distinguishes it from that of the defendants. This is in accord with Judson Dunaway Corporation v. Hygienic Products Co., 1 Cir., 178 F.2d 461, 465, in which the plaintiff was denied relief both for violating the trademark and unfair competition. In that case plaintiff marketed and promoted its toilet cleanser with representation of a woman pouring the contents of a can into a watercloset. The court held that the plaintiff was "not * * * entitled to appropriate exclusively unto itself the merely descriptive element of its composite marks. It cannot prevent the defendant from using on its labels or in its advertising * * * a representation of material flowing from a can into a watercloset bowl. * * * Nor do we think that the plaintiff can prevent the defendant from going one step further and advertising its product by showing it in use by a person, and, moreover, in use by the sort of person who would normally be expected to use it, that is, by a woman."

The Fourth Circuit Court, in Reddy Kilowatt, Inc. v. Mid-Carolina Electric Cooperative, Inc., 240 F.2d 282, 285, held:

"It does not follow that the plaintiff has made out a case. Its claims to an exclusive field are not entitled to the breadth which is implicit in its arguments. It must be kept in mind in the first place that the plaintiff was not the first to make use of a fantastic humanized figure for advertising purposes; nor was it indeed the first to use such a character in the field of electricity."

The same situation was presented in Jantzen Knitting Mills v. West Coast Knitting Mills, 46 F.2d 182, 184, 18 C.C. P.A., Patents, 843, displaying a swimming suit worn by a girl standing in a diving posture. It was there stated:

"We do not think that appellant has a right to monopolize the figure of a diving girl clad in a swimming suit. It is a well-settled principle of the trade-mark law that a mere representation of the merchandise on which the mark is used cannot be adopted as a trade-mark." Nims Unfair Competition and Trade-marks, Fourth Edition, Page 686.

A decree will be entered in this case declaring in the first instance that the patent in suit has been rendered invalid by reason of the willful concealment from the Patent Office of the Burlington three-end monofilament torque nylon yarn which was fully known to the patentees and known to have been in use for more than a year before they filed their application for the patent in suit. But for this fact the court would hold the patent valid as to the claims set forth above and infringed, but that the defendants are not entitled to equitable relief either by way of accounting or injunction, because of the misuse of the patent, and that the defendants be restrained from interfering with the plaintiffs in the manufacture and sale of the accused stockings and from threatening to sue or instituting action for infringement against the customers of the plaintiffs, and that the defendants be taxed with the costs.

The court will not assess any attorney fees. All of the parties, both plaintiffs and defendants, are licensees under Patentex to heat treat and impart torque to monofilament nylon yarns. Patentex advised its licensees that they had the right to utilize the privileges granted under the license to heat treat and set and twist monofilament nylon yarns and to make hosiery therefrom without infringing any valid claims of the Bird Patent. The plaintiffs in good faith believed that they had the right to do so and were advised by counsel of their right to do so, and if the defendants in this case had prevailed, I doubt if this court would have taxed attorney fees. In respect to the defendants, the court is of the opinion that they should not be taxed with attorney fees for the plaintiffs.